Thank you, your honor. May it please the court, my name is Paul Turner. I'm an assistant federal public defender in the District of Nevada. I'm here this morning to represent Mr. Schneider. I'd like to reserve two minutes for rebuttal. Just note that. Very good. Unless the court will directly authorize, I'm going to address the issues in the order that the Certificate of Appealability listed them. However you like. So the first issue, maybe apropos today, is the First Amendment issue. Obviously, our client's position is that the essence of Dawson v. Delaware, that Supreme Court case was violated when his co-defendant was, I believe deliberately, injected into the case Aryan warrior language, and not only that, alleged actions by the Aryan warriors. Well, of course it was deliberate. It was her defense. Compulsion was her defense. I don't think you would quarrel with that, kind of. I'm sorry. No, I don't. Your issue is whether or not the case should have been tried together, but there's no quarrel about the defense she was raising. Not at all, Your Honor. The only reason I use the word deliberate is that I believe the lawyer actually intended, may well have intended, for the information in violation, I believe, of the inlimity proceeding. The lawyer meaning her lawyer? Yes, Your Honor. The reason I say that is because in discussing it with the court during the inlimity proceeding, he used the term biker babe, which she apparently identified, and she did, with Aryan warriors. When he questioned her on direct, he used the same term again. And not surprisingly, her response was immediately into the Aryan warrior subject. So I question whether that was an accident. I do. But be that as it may, I certainly don't question the lady's right to a defense. Did you agree that under Harrington v. Richter, that the standard we have to apply here is there's no habeas relief as long as, in quotes, fair-minded jurors could disagree on the correctness of the state court's decision. Do you agree that's the standard here? I believe it is, Your Honor. I mean, the way I believe it's articulated is we have to show that it's objectively unreasonable, the application of Dawson. Well, not just unreasonable, but that fair-minded jurors could not find it otherwise. I believe we can show that it's objectively unreasonable. I believe we have shown that it's objectively unreasonable. The reason being, of course, that our client was put in an untenable position. He appropriately, in fact, both defendants asked for a severance of this case. And if a severance had occurred, I wouldn't be here on this issue, obviously. The lady would have had her defense and could have raised whatever legitimately she wanted to raise. My client would have had a fair trial. Well, in this case, the remarks were not admitted over objection. As I recall, the court admonished the jury regarding the second remark. What more could the judge have done? The admonishment, Your Honor, is so perfunctory in our judgment. And I believe in the cases, Bruton being one, but many, many cases, both the U.S. Supreme Court and this court, many of the jurists here in this court have noted that this perfunctory sort of warnings don't really have an effect on a jury. Aryan warriors is a term that's essentially equivalent to saying you're a Nazi, basically. That's exactly what it is. It's not just essentially. That's what it is. So your position is that if somebody says that, it is a per se new trial guarantee. Is that right? If it's done outside the exceptions, we realize there are exceptions of the rule. If it goes to an element of the crime, this didn't go to an element of the crime. In fact, the prosecutor indicated he had no interest in the subject he said. He said he had no interest at all in this subject. But how do you – Judge Wallace, of course, brought up the key point here, which is that you have another defendant who is putting on her defense. If you don't let her do that, then she's deprived of a constitutional right, perhaps, in order for your client to get a fairer trial. Isn't that really what we're wrestling with here? I think that's true, Your Honor. But First Amendment comes into play and overlays this whole thing. My client's First Amendment rights are not – should not be abolished, basically, because of somebody else's right to a fair defense. They're critically important rights on both sides. What is your client's First Amendment right in this particular situation? It's a right to not be called a bad person because he belonged to an organization called – or allegedly belonged. Is that a First Amendment right? Aren't you really arguing a Sixth Amendment right, that he didn't get an appropriate trial? Your Honor, I don't believe I am, but I understand what Your Honor is saying. I believe I'm arguing that his First Amendment right was denied when the terminology was used here. And I can emphasize that a little bit more, maybe. And your view is it's a First Amendment problem, a right not to have something be said, not a right to be freedom to say – have the freedom to say what you want to say. Is the opposite? Yeah. Because the terminology here, Your Honor – What's your case on that? The terminology here – What's your case? I'm sorry. What's your case? What's the best case citing that? That – I'm sorry, Your Honor. I didn't quite understand. Anything from the Ninth Circuit or the Supreme Court? What is your best case to substantiate your position? I believe Dawson is my best case. Dawson is your best case. But also here, here it's Flanagan, Your Honor, from the Nevada Supreme Court. Because, as we all know, because of comedy and, indeed, the way AEDPA is set up, the ruling by the Nevada Supreme Court is critically important here. And that court, that court found that Dawson applied. They didn't apply it the way we're asking this Court. We say they applied it wrong. But there was no question in that Court's mind that Dawson applied to this case. And they applied it to this case. How do you argue against the government's position on relation back? On grounds three through six, Your Honor? Yes. We've made arguments in our briefs, but I'd like to add an argument to that. The argument I would add is, as Your Honor knows, the judge here, the United States District Judge, found equitable tolling through November 20, 2005, the day Mr. Schneider mailed his state petition. Based on that ruling, Mr. Schneider had until November 20, 2006, to file whatever he wanted to file in his federal petition with no relation back problems. He filed. He pursued his state petition. Amazingly, it was denied within a few months, which is shocking to me, the way things usually move. But at any rate, he went into federal court in August of 2006 with his pro se petition. On the front of it, it says, in essence says, please give me a lawyer. I want a lawyer. The Court sends him a pro forma order, which is standard procedure, saying we're looking at this. We're going to follow up on this. And in essence saying, hold your horses. Hang on. We're going to look at this. We're going to process it. They didn't say hold your horses. No, I'm sorry. They didn't say that. They did not. We never hold horses. That's a second case. No. What happened, Your Honor, what happened, Your Honor, is that they then said to him in August, late August of 2006, they said, you haven't paid your $5 for an informal paupers. You got 30 days. In 20 days, he paid it. Everything's fine. He heard nothing from the U.S. District Court. What was happening was that the judge was being replaced by another judge. Judge McKibben was replaced by Judge Dawson. Mr. Schneider didn't know that, however, until November 22nd of 2006, two days after his year would have run under Judge Dawson's theory here. Five days later, November 27th, seven days after his year would have run, he got a lawyer, us. My argument would be that if you accept the equitable tolling and no cross appeal on equitable tolling in this case, then the equitable tolling should be extended with respect to this additional year in seven days. And what did the district court respond to that particular argument? That argument wasn't made, Your Honor. I mean, the argument I just made? Yes. I don't believe it was made. Doesn't that mean it was waived? Well, we made arguments for mail and for relation back. I know, but if your argument wasn't made in the district court, isn't it waived here? I don't know that it is if the subject matter was discussed in detail, Your Honor. I mean, I would have... This is all new to me. I've read your brief and I didn't see this argument anywhere close to it. I totally agree with you, but I'd like to think that in preparing for oral argument, you would want us or want the lawyers to look at it again. And when I looked at it again, and also a colleague of mine, frankly, pointed out some law to me that I didn't realize existed, to be honest about it. And then I realized in looking at this, what chance did Mr. Schneider have to do anything else? I don't think he had any other chance. And I think this Court should recognize that his filing is timely and all grounds are timely. Well, we may be able to send that back, but we can't rule on something that's never made in the district court. I certainly understand, Your Honor, but I wanted the Court to know about that because I thought it was important. Because saying Mr. Schneider was untimely is not right here. He did everything he could do. And he was told. He was told that it's being processed, being processed, but it wasn't processed until after his year, as it turned out, had run. I don't know if the Court would want me to return to the First Amendment just briefly. Well, you can do whatever you want, counsel. I just want to be – I just want to let the Court know that this seriously damaged Mr. Schneider. Is that your best argument? You've got a number of arguments that you've made here. You've touched on the First Amendment one and on the tolling issue. Are those the only matters that you want to raise? No, Your Honor. One very important matter deals with cause and prejudice. Okay. This is a case where equitable tolling was found, extraordinary circumstances by this judge because Mr. Schneider had a mental illness. I know you've read his opinion, probably more than I have, and you know he says over and over that this affected Mr. Schneider's ability to file. Not only that, and very importantly, I think, is that Mr. Schneider was on various medicines. You're talking about amended Ground 6? Well, yeah, I'm actually – Are you talking about the relation back or are you talking about a separate issue? No, 2 and 7. Okay. Yeah. Grounds 2 and 7 deal with the cause and prejudice. Okay. 2 is related to Ground 1, but it's an ineffective assistance grant counterpart. Right. 7 deals with the failure to raise any question about competency on a man who was getting about four psychotropic drugs over at the local jail. How do you deal with TACO? That's the point. Yes. TACO, to me, Your Honor, deals with the person who has a borderline – it says borderline personality deficit. I believe those are the words. Well, it says that mental illness is not an excuse for procedural default, doesn't it? I don't think it says that. What does it say? I think what it says is that if you've got something that's in essence not an illness – I mean, being mentally retarded I don't believe is an illness. I think that's just who you are. It's like being short or being tall, being whatever. It's very unfortunate, obviously. But that's just who you are. Being mentally ill is a disease. Mentally ill is different. And mentally ill also in this context. Help me with this. I read TACO to say that mental illness is not an excuse for procedural default. How do you distinguish that? I think it's distinguishable because we look to the standard, and I realize the standard indicates that it has to be an impediment external to the defense. Right. The impediment external here is that, first of all, it's an illness that comes from the outside, not the inside. Two, he's administered with various psychotropic drugs that are clearly external, that are put into his body. Right. And that create, according to Judge Dawson, create problems for him to file. This Court has said that, obviously, in the Bills case, which I filed a 28-J on, in earlier cases, but it's made crystal clear that mental illness is an extraordinary circumstance. I believe if you read Murray v. Carrier, if you read Coleman and these cases that set forth the cause and prejudice standard, they're talking about ordinary, ordinary default. Let me ask you. Let me ask you a question I'm having trouble with, and that's this objective factor external to the defense. And I'm looking specifically at the High case, but it's our High case, but it's in several of the other cases where we said a showing of cause must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded the prisoner's efforts to comply with the State's procedural rule. Now, how is this external to the defense? My answer, Your Honor, would be it's external in the sense that it's an illness which comes from the outside into somebody. It's external because drugs are injected or you take by the mouth. But drugs from the outside, external to your body, are put into your body. And Judge Dawson has held that that inhibited this gentleman from doing what he needed to do. It was one of the factors, and Judge Dawson has recognized that. So intoxication would be, would qualify in that same setting? It would. It would. And this Court, in the other case, I filed the 28J letter on Friday. I realize that's late, pretty late in the game. But the Waldron case, I believe it is, that case actually talks about extraordinary circumstances as being external. My argument is that this man, something, mental illness can rise to a height that you have no control. In other words, mental retardation is something that, unfortunately, I think you're born with. You have some control up to a point. When you're mentally ill, you're losing control of yourself. That's an external problem. You can't control what you do. In this case, Mr. Schneider could not control his inability to do what he needed to do. He was mentally ill and incapable of doing that. And that's what the Court found. If you want to save, we're going to give you a minute of rebuttal, but if you want to just save that minute, let's hear from the government. Thank you, Your Honor. Thank you. Turn this down just a touch. Good morning. My name is Dan Roche from the Office of the Veteran Attorney General, and I represent the respondent. Although the District Court didn't get everything exactly correct, it reached the right result. And for that reason, we asked that she would affirm its order. The first issue for which it granted a Certificate of Appealability was whether the Nevesta Supreme Court's rejection of Mr. Schneider's claim that he was prejudiced by his brotherhood at a trial was an unreasonable application of Dawson v. Delaware. In Dawson, the United States Supreme Court held that the stipulation that the defendant was a member of their brotherhood at a capital sentencing hearing may or may not have been back to state court. With those facts in mind, it's clear that Dawson is distinguishable from the present case for several reasons. Dawson was a capital case. The evidence in that case was admitted at sentencing and not during the guilt phase of the trial. Does that make a difference? I wondered about that, whether it's for the guilt phase or the sentencing phase, if that's an appropriate basis for distinguishing the case. I wouldn't rely on that factor by itself to distinguish this case from Dawson. I think that if evidence of that nature is prejudicial, it could be prejudicial during the guilt phase of trial. I'm not going to go so far as to say it couldn't. But I think that plays a part along with the other factors why this is a totally different case. Are you relying on Harrington to deal with this issue? Yes. I mean, the Nevada Supreme Court's decision has to be objectively unreasonable. And the court, the United States Supreme Court in Harrington, stated that. That means that there can't be any possibility for disagreement among fair-minded jurists. So basically, if you assume all of us are fair-minded jurists, we have to unanimously agree that what happened here was just so off the wall that we can't uphold it. Not just that you three would have to unanimously agree, but you would have to conclude that all reasonable jurists in the entire world, when viewing this issue, would agree that the Nevada Supreme Court got it wrong. Not to include Iran? If you think they have any reasonable jurists in Iran, then you can include them. I wouldn't comment. Maybe we'll limit it to the United States of America. Okay. But that's the United States Supreme Court's jurisdiction. But that's the standard. Basically, all fair-minded jurists would have to agree that that was an erroneous decision. And it wasn't, for several reasons. I would note that the Nevada Supreme Court applied the correct legal standard. They applied Dawson. They knew it existed. They reviewed the trial record. These were two statements in the defense's case that were offhand comments. Basically, the evidence that was prejudicial to Mr. Schneider from those would have come in even if she hadn't mentioned which game he was a part of. She basically testified that her co-defendant, and this is Lisa Demmer, Mr. Schneider's co-defendant at trial, testified in her own defense that she was afraid if she didn't go along with Mr. Schneider, she would have been killed and that he had two people following her. She identified them by name. She could have said that exact same information without specifically referring to a gang, which gang could have been the Mongols or the Hells Angels, and the same evidence would have come in. So, to argue that this Aryan Brotherhood statement is so prejudicial that it is wrong. Mr. Schneider had been proven guilty without a reasonable doubt before any of this evidence came in. The victim was an acquaintance of both co-defendants, identified them, testified that they came to his apartment. They tied him up. They stabbed him. They tortured him. They ransacked, tried to find his money. He had basically gone on a string of success at the local casinos and had several thousand dollars in his apartment. Could you explain to me the government's position on whether this is, for the Leishenbach Doctrine, how this is the same core of operative facts on whether the lawyer should have examined the defense of the co-defendant and known this was going to come up with the core, with the amended petition, which indicates the defendant should have granted a mistrial sua sponte? Are you referring to whether Ground Five relates back? Yes. Okay. Ground Five in the first amended petition was that he was denied, Mr. Schneider was denied his constitutional rights because counsel failed to properly investigate his case. Now, if you read the facts that were given, he argues that, Mr. Schneider argues that he and his mother provided names of witnesses to his defense counsel, and his defense counsel did not investigate those names to basically prepare for trial. Ground One Three in the original petition was a claim that trial counsel did not investigate the co-defendant's trial strategy. I don't know what obligation you have to investigate another person's defense at trial, but that's the argument. That's not the same core facts. It's basically a different thing that he is claiming his counsel should have investigated. Yes. It doesn't matter whether it's a good or bad argument. The question is whether it comes within the core, the central core of facts. Yes. The government's position is that it's not. Now, in doing this, do we have to take into consideration the first petition was filed by a pro se, and we have some cases that say when they're pro ses, we give them a lot of liberal viewing. Based upon that, isn't it close to the same core of facts in the sense that it's dealing with the same issue? And I want the government's position on that. The government's position is that, yes, you can take into account that it was a pro se petitioner. However, claims of ineffective assistance of counsel are fact specific. And a simple claim that counsel was ineffective for failing to investigate does not relate, I guess, relate forward. But a future claim of ineffective assistance of counsel for failing to investigate something else or do something different does not relate back to that claim. Even if you're a pro se petitioner. He presented the factual basis for his claim in his original petition. He said that counsel didn't investigate what she would testify to and on behalf, if she would point the finger at him, would she testify about his abstract beliefs. So the pro se petitioner who filed the original petition made factual specifications to support his claim. They're different from the factual specifications that exist in support of Ground Five in the amended petition. Any specific cases in this area that will help us? I'm sorry, off the top of my head, I can't think of any. I think it's a well-established provision that claims of ineffective assistance of counsel are fact specific. It's the same cases that relate back to exhaustion of ineffective assistance of counsel claims. Those claims, likewise, are unexhausted by different claims of ineffective assistance of counsel. Moving on to the final claim of whether Mr. Schneider's mental illnesses provide good cause to overcome the procedural default of Grounds Two and Seven. They don't. As the district court correctly determined, his mental illness is not external to the defense. And on that basis alone, the state would argue that the district court made the right decision. Now, even if we were to take the additional step of correlating the equitable tolling standards with the good cause standards, which the state's position is they're different. When the United States Supreme Court decided at Holland v. Florida and set forth the standard for equitable tolling, they could have clearly said, we're going to apply the same standard that we've used all these years for good cause and prejudice. They didn't. They set forth a different standard. But even if we apply the same one, our position is that the district court fared by finding that equitable tolling was warranted. Whether or not his mental illness provides some extraordinary circumstance that prevented him from timely filing, Mr. Schneider has not shown reasonable diligence. And that's the standard for equitable tolling. And that's the standard that he's trying to apply here for good cause. What's your view about the role of TACHO in this case? TACHO stands for the proposition that a mental illness is not external to the defense. And it's the Ninth Circuit president that this was a problem. So we're bound by that, are we not? Yes. What was the mental illness in TACHO? I'm not aware. It was different from the mental illness here. I can review the case quickly and find out if you're interested in it. But I don't think that that's particularly relevant. The other issue in TACHO was whether he had been prevented from having the assistance of a fellow. The Eighth Circuit's gone a little different from us in this regard. Should we bend our way and not have an inconsistency between the Ninth and Eighth Circuit? What's your position on the Eighth Circuit approach? Well, the Eighth Circuit approach, for one thing, is inconsistent itself. If you look at older Eighth Circuit cases, let me see if I can find the one I'm thinking of. They held that mental illness might not be external to the defense. And then in recent cases, they've just assumed by citing other cases that it was that mental illness could satisfy the cause and prejudice standard. But they don't do so with any reference to the, quote, external to the defense language. The Eighth Circuit cases that have applied mental illness to show cause to overcome procedural bars are absent any reference to external to the defense. So it doesn't appear to me that the Eighth Circuit has even considered the exact issue that is before this court right now. On the other hand, there are other circuits that agree with the Ninth Circuit that mental illness is not something that's external to the defense. I believe it's the Third and the Seventh Circuits. Let me find my notes really quickly. Yeah, the Third Circuit in Holby-Freeman and the Seventh Circuit in Harris v. McAdory and Morgan v. Chandler. As recently as 2010 have held that mental illness is not external to the cause. The Eighth Circuit's inconsistencies, I think, if you look at Korman v. Armantrout, 959 Federal Second 727 from the Eighth Circuit in 1992, they held that mental illness might not provide good cause because it wasn't external to the defense. And then all the cases that are cited by appellant in this brief, such as Holt v. Bowersox, occurred subsequently but without any reference to that decision or any application or analysis of what the external to the defense language means. And so for that reason, I'd say, no, this Court shouldn't follow the inconsistency of the Eighth Circuit but should be consistent with its own precedent as well as the Third and Seventh Circuits. But we really can't follow them if ours is binding under Miller. Aren't we bound by Tacho, assuming it's on all fours? Yes, I would say so. But to the extent there's any distinguishing factors, then I would still suggest that this Court follow Tacho. Tacho is what you eat. Tacho is this case. Tacho is this case. Another thing that I noticed about Tacho was it involved whether he had the assistance of a fellow inmate to prepare his petition. In this case, Mr. Schneider's supposed factor that prevented him from filing was his mental illness, but he still has those mental illnesses. Nothing has changed. He had the assistance of a fellow inmate help him prepare a petition, and that's the change that allowed him to file a petition. Well, there's no evidence in the record for the previous eight, seven years since his conviction became final that he couldn't have asked a fellow inmate to help him prepare a petition. There's no evidence that he tried. Well, in Tacho, the point is made that he had the assistance of someone. Exactly. In Tacho's case, we don't know. We don't know in this case. But we do know that the record is absent of any indication that he sought or requested or made an effort to find any assistance. When that assistance was provided, the district court decided, well, that solves his equitable tolling problem. That provides a reason why he can file. And so, therefore, it eliminated the extraordinary circumstances that prevented him from filing. Well, I don't see how you can take Tacho with precedent when there was an effect that was there was someone helping him. It's a different case. We've got a new case on this one. Well, I think what they said in Tacho was that the case that they relied on previously hadn't had any assistance. And so here where he even had assistance. But that was an illiquid precedent. That was a different. There are some differences. It's not exactly factually the same exact case. But it is precedent in the circuit. It's consistent with other circuits other than the Eighth. And the Eighth isn't consistent with itself. And for that reason, I think that. Could I ask you a question about the record as it stands before us? Yes. Counsel argues that we should go with the Eighth Circuit case. But as I understand it, there, there was a conclusive showing that mental illness interfered with Petitioner's ability to appreciate his or her position and make rational decisions. What does the record show in this case? It doesn't show that. It shows in this case that he had a mental illness that prevented him from focusing and concentrating and following through on something for an extended period of time, the length of time that the expert in this case concluded it would take to prepare a federal habeas petition or a state habeas petition. Counsel indicates that it's not just the mental illness. It's the medication that he receives for his mental illness. What's the record show as to medication received by the Petitioner? The expert testimony in the district court indicated that he had taken three different drugs at different points during his incarceration and that some of them did have negative effects on his ability to process thoughts, I would say. That's definitely true. But that's inherent to his illness. He was being treated for it to help him eliminate other negative effects such as music or auditory hallucinations, whatever else he was going through. These drugs were intended to eliminate those effects and help him function better. And so I don't think that that makes a difference. But, yes, that's what the record reflects is that he was on medication. Thank you. Unless the Court has other questions, we thank government for its presentation and we'll allow you a minute of rebuttal. My first point would be that cause and prejudice is an equity-based legal standard and equitable tolling, this Court has such a high standard for it. My client met that. So he meets an extraordinary high standard for equitable tolling. But what the state is saying and what the district court has said is he can't meet an equitable-based standard to toll his state petition, even though the court found, our court, district court, that it was nearly impossible for him to file a habeas petition. They don't say federal or state during the time period. And I think it's important. He would be late under both. TACO is based on... He was pretty timely with his state petitions, wasn't he? Well, we tried to argue he was, Your Honor, but he was timely only after he got help. Yeah, but the reality is he filed them. But he was out of time. See, it had been seven years. So these things are on parallel courses at a certain point and they're both moving forward. The district court says they're both nearly impossible to do either. That's what the court is saying. Okay. TACO is based on Hughes. Hughes, of course, is illiteracy. And my only point, I made it before, is that illiteracy and mental retardation are different from mental illness. Okay. Thank you, Mr. Chairman. I have a question. Suppose we were persuaded by you on that. What would you argue when you get back to the district court? What answers would be left for you? Well, depending on how the court deals with my First Amendment. No, let's assume you lose it. Oh, I lose my First Amendment but I get back on the other? Well, Ground 2 is an ineffective assistance related to Ground 1, so I'd certainly try to pursue that and hope that I could succeed on that. But maybe more, most importantly, I would go on the competency issue, which is Ground 7. I would very much like to address that on the merits, that this man should have been examined for competency and his lawyer never asked for an examination. So I'd be pursuing that. I see the force of your argument for going back, but this case has gone on 15 years since he was convicted. And you've got to be a very hopeful and brave person to think something different is going to come out. No, Your Honor, and I don't mean to take up court's time. I've had a client who was denied 13 times. The 14th was the winner. So we just don't give up. That's just the way we try to operate. I know the same way you practice, Your Honor. Well, thank you both for your argument. The case of Schneider v. McDaniel is submitted.
judges: Wallace, Noonan, Smith